*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DANIELLE SACCO,

        Plaintiff,

v.

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

Civil Action No. 19-19825 (FLW)

**OPINION**

**WOLFSON, Chief Judge:**

Danielle Sacco ("Plaintiff") appeals from the final decision of the Commissioner of Social Security ("Defendant"), denying Plaintiff disability benefits under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and, accordingly, is affirmed.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on September 16, 1982, and was 32 years old on the alleged onset date of July 15, 2015. (Administrative Record ("A.R.") 18, 12.) Plaintiff graduated from high school and completed one year of college prior to her disability. (A.R. 69, 150.) She also worked as a receptionist, a reservations clerk, and a travel agent prior to her disability. (A.R. 150.) Plaintiff filed an application for Social Security benefits on May 24, 2016. (Plaintiff's Moving Brief ("Pl. Moving Br."), at 5; *see also* A.R. 10.) When that claim was denied on September 7, 2016, Plaintiff requested a hearing, which occurred on August 27, 2018, before Administrative Law Judge Daniel Balutis ("ALJ"). (Pl. Moving Br., at 5; *see also* A.R. 10, 218.) The ALJ's decision, rendered on

October 17, 2018, found that although Plaintiff was incapable of performing any of her prior jobs, which were semi-skilled to skilled in nature, she could perform a significant number of sedentary, unskilled jobs existing in the national economy, and, therefore, was not disabled, as defined under the Act. (Pl. Moving Br., at 1.)  Plaintiff filed a Request for Review of the Hearing Decision with the Appeal Council on October 15, 2018, which was denied on August 20, 2019.  (Pl. Moving Br., at 10-11; Defendant's Brief ("Def. Br."), at 12.) Afterwards, Plaintiff filed the instant appeal.  (Pl. Moving Br., at 12.)

### A.    Review of Medical Evidence

#### i.    Medical Evidence Following First Stroke

Plaintiff suffered her first stroke on July 15, 2015.  (A.R. 414-572.)  Following two surgeries and a nine-day hospitalization at Overlook Medical Center in Summit, New Jersey, Plaintiff was moved to an inpatient rehabilitation facility, where she received intensive physical, occupational, and speech therapy (A.R. 414-572, 577-859, 875-76, 887-88, 893-94.)  Two months after her stroke, on September 14, 2015, Plaintiff was discharged.  (A.R. 587, 593.)

Over the next month, Plaintiff participated in outpatient physical therapy at Kessler Rehabilitation Center ("Kessler") approximately three times per week to improve the function and strength in her right arm and right leg.  (A.R. 867-74, 1696-1729.)  In mid-September 2015, it was noted that Plaintiff required only minimal assistance in basic care activities.  (A.R. 867.)  By October 2015, Plaintiff had experienced notable improvement in her upper extremity muscle testing.  (A.R. 870, 873.)

In October 2015, Plaintiff began ophthalmological treatment.  From October 2015 through November 2016, she was treated by Bardha Fejzo, O.D., and Roger Turbin, M.D., a neuro-ophthalmologist, for complaints of double vision, blurred vision in her right eye, and right eyelid

twitching.  (A.R. 898-916.)  Dr. Fejzo reported that no visual disturbances were found on Plaintiff's visual field.  (A.R. 919.)  Dr. Fejzo declined to provide an opinion regarding Plaintiff's work-related abilities.  (A.R. 920.)  Dr. Turbin first evaluated Plaintiff on October 20, 2016 (A.R. 1683-1689), and again on November 3, 2016.  (A.R. 1678.)  He diagnosed Plaintiff with Perinaud Syndrome, blurring and double vision, and poor reactivity to light.  (A.R. 1682.)  Moreover, Dr. Turbin's treatment notes from November 3, 2016, contemplated surgical procedures to fix Plaintiff's eyes in a partial placement in downgaze.  (A.R. 1678.)

In October 2015, Plaintiff was also evaluated by neurologist David Wells Roth, M.D., one of the physicians who had treated her during her hospitalization at Overlook Hospital.  (A.R. 860-63.)  At that time, Plaintiff had an ataxic gait, reduced muscle strength in her right upper extremity, and expressive aphasia.  (A.R. 862.)  Otherwise, her examination was normal.  (A.R. 862-63.)  In particular, Plaintiff demonstrated normal ability to communicate, intact memory, normal attention/concentration, and appropriate "fund of knowledge."  (A.R. 861.)  She had 20/20 vision in both eyes and grossly intact visual fields.  (A.R. 861.)  Plaintiff exhibited intact cranial nerves, normal muscle strength and tone on her left side, intact and symmetric deep tendon reflexes, and normal finger-to-nose coordination.  (A.R. 861-62.)  Dr. Wells Roth opined that Plaintiff was "doing well and […] improving daily with her speech and right upper extremity."  (A.R. 862.)  He recommended continued rehabilitation and a follow-up visit in six months.  (A.R. 862.)

From November 2015 through February 2016, Plaintiff attended approximately twenty-five outpatient physical therapy visits.  (A.R. 878, 1736.)  At discharge, Plaintiff was "feeling good" and "positive" about her progress.  Indeed, she had transitioned to a fitness program.  (A.R. 878, 1736.)

During a neurological follow-up visit with Dr. Wells Roth on July 7, 2016, Plaintiff exhibited only slightly reduced muscle strength in her right hand.  (A.R. 880.)  Otherwise, her examination was normal.  (A.R. 880.)  Plaintiff exhibited a normal ability to communicate, intact memory, normal attention/concentration, no aphasia, and an appropriate level of knowledge.  (A.R. 880.)  She demonstrated 20/20 visual acuity, grossly intact visual fields, intact cranial nerves, normal muscle strength and tone on her left side, intact sensation, symmetric deep tendon reflexes, and normal finger-to-nose coordination.  (A.R. 880.)  Dr. Wells Roth reported that Plaintiff was "doing very well" and had only "some mild right hand weakness and [minimal] right leg weakness which are improving." (A.R. 881.)  He opined that Plaintiff had "no restrictions at this time and may return to normal daily functions as she feels comfortable with," and he recommended follow-up in three months.  (A.R. 881.)

In August 2016, Plaintiff established primary care at Hunterdon Family Medicine at Highlands.  (A.R. 955-58.)  During an examination in October 2016, Deirdre Brazil, M.D., noted that Plaintiff reported continued difficulties with her right arm (R. 952), double vision, fatigue (R. 951), depression with difficulty concentrating, feelings of guilt, and little pleasure in life.  Dr. Brazil also noted that Plaintiff had a right-sided facial droop, slightly slurred speech, and right arm weakness, but otherwise normal findings, including normal balance and gait, normal sensation, normal memory, intact cranial nerves, a normal mood and affect, and normal insight and judgment.  (A.R. 952, 957-58.)  Dr. Brazil referred Plaintiff to a neurologist and prescribed Effexor to treat Plaintiff's depression.   (A.R. 952, 957-58.)

From September 2016 to October 2016, Plaintiff attended outpatient physical therapy at Atlantic Health Rehabilitation Care Services to address and treat right upper extremity weakness.  (A.R. 1763-1825.)  On September 8, 2016, the evaluation report noted that Plaintiff displayed

decreased strength, coordination, fine motor skills, gripping ability, grasping, decreased performance of household chores, and increased pain.  (A.R. 1799.)  The reports also noted hand fatigue (A.R. 1773), moderate or severe difficulties with many activities of daily life using her hands (A.R. 1779), difficulty holding a kitchen spatula (A.R. 1777), easy fatigability (A.R. 1780), reduced coordination with shoulder flexion and abduction, and increased ataxia.  (A.R. 1786.) Specifically, Plaintiff was described as having "severe limitations with overhead motion and overall use of the right [upper extremity]" and "severe lack of neuromuscular control/coordination." (A.R. 1793, 1803.)  By early October 2016, however, Plaintiff's range of motion, strength, and function in her right upper extremity had improved.   (A.R. 1776.) Nonetheless, Plaintiff was discharged from the program after she failed to attend several scheduled visits.  (A.R. 1763.)

An MRI of Plaintiff's brain on October 27, 2016, showed abnormal brain pathology consistent with white matter changes, chronic ischemic changes, and previous hemorrhage (A.R. 938-939.)

In December 2016 and January 2017, Plaintiff sought treatment from Paul Singh, M.D., a neurovascular surgeon.  Dr. Singh found that Plaintiff suffered from intermittent headaches, and "occasionally still has some dizziness and double vision that is worse with up gaze." (A.R. 1690.) Dr. Singh also found that Plaintiff has "persistent weakness on the right side, which is unchanged from before." (A.R. 1690.)  Dr. Singh recommended a cerebral angiogram to determine if there was an underlying vascular anomaly to account for her prior hemorrhage.  (A.R. 1691.)  Despite these findings, however, Plaintiff also exhibited spontaneous and fluent speech and she was able to follow all commands.  (A.R. 1691, 1694.)  She had 5-/5 muscle testing and normal muscle tone in her right arm and leg; intact sensation; intact coordination; and some mild ataxia with tandem

gait.  (A.R. 1691, 1694.)  Dr. Singh noted that Plaintiff was "neurologically improving."  (A.R. 1691.)

### ii.   *Medical Evidence Following Second Stroke*

In February 2017, Plaintiff suffered a second stroke, which required hospitalization for one week from February 19, 2017 through February 25, 2017.  (A.R. 965-1009.)  An MRI performed on Plaintiff's brain on February 19, 2017, showed multiple lesions with restricted diffusion in both cerebral hemispheres compatible with chronic ischemia.  She had embolic ischemia/infarction, and encephalomalacia within the left frontal lobe, and insular cortex and thalamus evidence of old blood product.  (A.R. 993.)

At a primary care visit in June 2017, Plaintiff showed slightly slurred speech, mild aphasia, and right arm.  (A.R. 942.)

Thereafter, on December 21, 2017, Dr. Turbin again evaluated Plaintiff's vision.  (A.R. 1671.)  His treatment notes from that visit indicate that Plaintiff had a significantly worse diplopia and exotropia since her second stroke.  (A.R. 1672.)  Dr. Turbin described Plaintiff as having difficulty expressing herself and noted Plaintiff's reports of "some double vision" that caused her to veer to the right with ambulation.  (A.R. 1672.)

Plaintiff returned to Dr. Wells Roth for a neurological follow-up in January 2018.  (A.R. 1748-50.)  At this time, Plaintiff sought clearance for driving and unsupervised custody of her child.  (A.R. 1748.)  During the visit, Dr. Wells Roth noted that Plaintiff appeared disorientated with a cognitive disability and poor remote recall.  (A.R. 1749.)  However, Dr. Wells Roth recorded no physical abnormalities or functional restrictions.  (A.R. 1749.)  He advised Plaintiff that she no longer needed to follow-up with him.  (A.R. 1750.)

In February 2018, Plaintiff began neurological treatment with Yanchun Zhang, M.D., whom she saw regularly through July 2018.  (A.R. 1753-61.)  Dr. Zhang's treatment notes reflect that Plaintiff reported poor eyesight, right arm weakness, clumsiness, and speech problems.  (A.R. 1759.)  However, upon evaluation, Dr. Zhang generally found Plaintiff to be healthy.  (A.R. 1753-61.)  He noted that Plaintiff displayed normal vision, no pain in muscles or joints, no limitation of range of motion, and also prescribed and adjusted Plaintiff's medication regimen.  (A.R. 1753-61.)  During examinations over this six-month period, Dr. Zhang further reported on several occasions that Plaintiff was oriented with fluent speech, displayed intact cranial nerves, a normal gait and station, normal finger-to-nose testing, normal arm swing, intact sensation, and normal muscle tone and power.  (A.R. 1754-61.)  Indeed, beginning in March 2018, Plaintiff reported her right leg weakness had improved with therapy and her speech was noted to be "improved." (A.R. 1753, 1755-57.)  By July 2018, Dr. Zhang indicated that Plaintiff appeared "much better since Nudextra" (A.R. 1753.)

In April and May 2018, Plaintiff attended two visits with cardiologist Qaisra Saeed, M.D. (A.R. 962.)  During both visits, Plaintiff was alert and oriented with fluent speech and positive dysarthria.  (A.R. 962, 964.)  Dr. Saeed noted no particular musculoskeletal abnormalities or limitations.  (A.R. 962, 964.)  Throughout 2017 and 2018, Plaintiff attended outpatient physical and occupational therapy visits at Kessler Institute for Rehabilitation approximately three times per week.  (A.R. 1010-1661.)  Plaintiff generally reported that she was able to use a handrail to climb; she was not driving; she could squat to the floor, although weak, she could get up from the floor independently; and she walked for up to thirty minutes.  (A.R. 1010-1661.)  Plaintiff reported that although it was sometimes difficult and took longer, she was able to use her right upper extremity to bathe, carry, dress herself, prepare meals, perform household chores, handle buttons

and zippers, write and type, and care for her personal hygiene.  (A.R. 1010-1661.)  Plaintiff did not use an assistive device like a cane or walker (A.R. 1010-1661.)

### B.   Review of Testimonial Evidence

#### i.   *Plaintiff's Testimony*

At the hearing before the ALJ on August 27, 2018, Plaintiff testified that she was 5'9'', 160 pounds, and her highest level of education was one year of college.  (A.R. 66, 69.)  She testified regarding her physical limitations, her daily activities, and her work experience.  As for her physical limitations, Plaintiff testified that she does not have physical pain on a regular basis.  (A.R. 87.)  However, Plaintiff testified that she has difficulty walking, standing, and sitting for prolonged periods of time, specifically her right leg and right arm begin to cramp.  (A.R. 88-91.)  As for her difficulty sitting, Plaintiff testified that she struggles to sit for more than one hour at a time, but if she walks for five minutes, she can return to a seated position.  (A.R. 93-95.)  Plaintiff further testified that while she generally does not have problems with her left arm and left hand, she cannot grab things with her right hand, nor can she turn a doorknob or pick up small objects.  (A.R. 96-97.)  Specifically, Plaintiff explained that the most weight she could pick up is eight pounds, and she could only lift that weight with her left arm.  (A.R. 95-96.)

With respect to daily activities, Plaintiff testified that although she can read and does not have problems focusing or mentally concentrating, she has difficulty with her vision.  (A.R. 100-101.)  According to Plaintiff, these vision problems, like periodic blurred vision, prevent her from driving and concentrating for extended periods.  (A.R. 121-22.)  Plaintiff also explained that she can type on the computer, and she uses her laptop and her cell phone daily for browsing social media and streaming television and movies.  As for her ability to write, Plaintiff testified that she is unable to write because of her difficulties with her right hand.  (A.R. 72, 102-103.)  Although

Plaintiff has tried to write with her nondominant hand, at the time of the hearing, those attempts were unsuccessful because the writing was not legible.  (A.R. 72-73.)  Plaintiff further testified that she does not have problems with basic addition and subtraction, but that she does have problems managing money.  Specifically, she testified that although she can manage a checkbook and a credit card, she cannot write a household budget.  (A.R. 73-74.)

Finally, as for work experience and her current employment, Plaintiff testified that at the time of the hearing, she was working at a CVS Pharmacy, where she began in May 2018.  (A.R. 77.)  Plaintiff testified that she was working ten hours per week for CVS at a rate of $11 per hour.  (A.R. 77.)  At the pharmacy, Plaintiff explained that she generally works with customers at the store's registers and drive-thru window.  (A.R. 77.)  Plaintiff also described her past employment, which included work as a travel agent and a receptionist, assistant, and officer manager at a chiropractic office.  (A.R.79-85.)

### ii.  Douglas Gellner

Plaintiff's friend and caregiver, Douglas Gellner ("Gellner"), also testified briefly at the hearing.  (A.R. 135-147.)  Gellner testified that Plaintiff lived with him for approximately one year in 2017.  (A.R. 135-36.)  During that year, Gellner testified that he had the opportunity to observe Plaintiff on a daily basis.  (A.R. 137-38.)  Although Gellner testified that in the time he has known Plaintiff, her overall condition has not progressed, he did testify that her walking has improved.  (A.R. 141, 145.)  Specifically, he testified that she has paralysis on her right side, which worsened following her second stroke.  (A.R. 141.)  With respect to her daily activities, Gellner testified only that she spent a lot of time watching television, that she had trouble remembering things, and that she was incapable of cooking and putting dishes in the dishwasher without breaking items.  (A.R. 146.)

### iii.    Vocational Expert's Testimony

Fran Terry ("Terry"), a vocational expert, also testified at the hearing on August 27, 2018. (A.R. 148.)   Using the Directory of Occupational Titles ("DOT"), Terry classified Plaintiff's previous relevant work, *i.e.*, office manager, reservations clerk, receptionist, and travel agent, as sedentary jobs.  (A.R. 150.) The ALJ asked Terry to consider a hypothetical person of Plaintiff's age, education, and work experience who could perform sedentary work as defined in the regulations, except she could frequently reach with the right upper extremity, including overhead; could frequently handle and finger; could never climb ladders, ropes, and scaffolds, or crawl; could not perform work that required good depth perception; could not operate a motor vehicle; could not be exposed to unprotected heights or moving mechanical parts; could tolerate frequent exposure to humidity/wetness, dust, fumes, odors, gases, and extreme cold or heat; could occasionally push/pull with the right upper extremity; was limited to simple, routine tasks; and time off-task would be accommodated by normal breaks. (A.R. 153-54.)   Terry testified that although the hypothetical person could not perform any of Plaintiff's past relevant work because her prior jobs were either skilled or semi-skilled, the hypothetical person could make a vocational adjustment to a significant number of sedentary, unskilled jobs existing in the national economy, such as telephone order clerk, charge account clerk, and clerical assistant.  (A.R. 154-55.)

In response to questioning from Plaintiff's attorney, Terry stated that the same hypothetical individual would not be able to sustain his or her job if they had double vision and could not look at a computer screen for more than a few minutes at a time without taking continuous breaks, were limited in how long they could sit or stand continuously, and required an assistive device like a rolling walker or a cane while standing.  (A.R. 156.)  Moreover, Plaintiff's attorney asked whether Terry's conclusion would change if the original hypothetical person presented by the ALJ could

only occasionally use his or her right hand for handling, reaching, fingering, or grasping as opposed to having frequent use of his or her right hand.  (A.R. 157.)  Terry responded in the affirmative, explaining that while the DOT provides certain jobs that would require only occasional handling and fingering, the ubiquitous use of computers in the workplace, especially for sedentary work, would demand at least frequent handling and fingering.  (A.R. 157.)  Thus, Terry testified that for all sedentary jobs, the ability to frequently use one's hands is required.  (A.R. 157.)  Finally, Terry testified that if a person had to take unscheduled breaks at work due to mood swings, crying, or being overwhelmed, that type of accommodation generally negatively impacts his or her ability to work.  (A.R. 158.)

### C.    Additional Medical Opinions

The ALJ's written decision cites three additional medical professionals who reviewed the material for Disability Determination Services ("DDS") and offered medical opinions on Plaintiff's limitations.  (A.R. 16.)  First, DDS medical consultant, Jane Esposito, Psy.D, performed a psychological evaluation on August 18, 2016, thirteen months after Plaintiff's first stroke and six months prior to her second stroke.  (A.R. 924.)  During the evaluation, Plaintiff presented complaints associated with a stroke, including reading difficulty, problems with the right side of her body, and difficulty with right arm mobility.   (A.R. 16.)  As for her speech during the evaluation, Dr. Esposito noted that Plaintiff spoke with some slight "intelligibility," was "garbled," and demonstrated difficulty with word finding.  (A.R. 16, 926.)  Dr. Esposito also found, however, that although Plaintiff cried intermittently throughout the evaluation, her concentration and focus appeared to be at an appropriate level.   (A.R. 16.)

Next, Tiziana Jasper, M.D., performed an evaluation on August 26, 2016, during which Plaintiff complained of weakness in her right arm and limited range of motion from the right

shoulder down to her hand.  (A.R. 16, 929-32.)  Dr. Jasper also found Plaintiff to have 20/20 vision

in the right eye and 20/20 vision in the left eye.  (A.R. 16.)

Finally, the ALJ noted that Karen Tennyson, Ph.D., conducted a neuropsychological

evaluation on November 17, 2016, at the request of the Office of Vocational Rehabilitation.  (A.R.

16.)  Dr. Tennyson diagnosed Plaintiff with status post CVA, neurocognitive deficits secondary to

CVA, and adjustment disorder with mixed emotional features.  (A.R. 16.)  Further, as noted by the

ALJ, Dr. Tennyson referred Plaintiff for evaluation by the Department of Vocational

Rehabilitation Services to assess her desire to return to competitive work.  (A.R. 16.)

### D.     The ALJ's Findings

Following the hearing, the ALJ issued a written decision on October 17, 2018, which

determined that Plaintiff had not satisfied her burden of establishing disability.  The ALJ evaluated

Plaintiff's case under the Commissioner's five-step sequential evaluation process.  (A.R. 10-20.)

First, the ALJ found that Plaintiff met the insured status requirement of the Social Security Act

through December 31, 2020.  (A.R. 12.)  Next, the ALJ found that Plaintiff had not engaged in

substantial gainful employment since July 15, 2015, the alleged onset date.[1]  (A.R. 12.) While the

record reveals that Plaintiff earned $450 in the first quarter of 2017, the ALJ found this did not

qualify as substantial gainful activity.  (A.R 12.)  The ALJ also determined that Plaintiff had the

following severe impairments: "cerebrovascular accident (CVA), right spastic hemiplegia with

vascular dementia, neurocognitive deficits secondary to CVA, binocular diplopia, alternating

exotropia with V pattern, Parinaud's syndrome after thalamic hemorrhage, second event; large

angle exotropia with intermittent fusion, small right choroidal nevus, and mild bilateral optic

---

[1]     The ALJ recognized that, at the hearing, Plaintiff testified she was currently employed by
CVS Pharmacy, but the record did not contain any supportive evidence with regarding to these
earnings other than Plaintiff's testimony.  (A.R. 12.)

atrophy, stable (20 CFR 404.1520(c)).”  (A.R., at 23.)  Along with those impairments, Plaintiff

was found to have non-severe impairments including depressive disorder and adjustment reaction

with mixed emotional features.  (A.R. 13.) These two impairments were found to be non-severe

because the objective medical evidence of the record demonstrated “essentially normal mental

status examinations” and, further, Plaintiff's crying spells were not reflected in the objective

evidence.  (A.R. 13.)

Then, the ALJ determined whether Plaintiff's impairments, either singly or in combination,

did not meet or medically equal any of the presumptively disabling listed impairments described

in the 20 CFR Part 404, Subpart P, Appendix 1.  (A.R. 13.)  Here, the ALJ concluded that Plaintiff

“is not presumptively disabled pursuant to 20 CFR 404.1520(d) because the evidence of record

does not document the specific findings required for listing level severity.”  (A.R. 13-14.)

At the next step, the ALJ made a determination on Plaintiff's residual functional capacity

(“RFC”).  (A.R. 14.)  The ALJ determined that Plaintiff could perform a modified range of

sedentary, unskilled work as follows:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform sedentary work as defined in 20 C.F.R. 404.1567(a) except
> she could frequently reach with the right upper extremity, including
> overhead.  The claimant could frequently handle and finger.  She
> should never climb ladders, ropes and scaffolds or crawl.  She
> should not perform work that requires good depth perception and
> she should not operate a motor vehicle. The claimant could have
> frequent exposure to humidity/wetness, dust, fumes, odors and
> gases, and extreme cold or heat. The claimant could occasionally
> push/pull with the right upper extremity.  The claimant is limited to
> simple routine tasks and time off task would be accommodated by
> normal breaks.

(A.R. 14.)  In reaching this conclusion, the ALJ considered all of Plaintiff's symptoms that were

supported by objective medical evidence, including opinion evidence and testimonial evidence

from Plaintiff, the vocational expert, and Gellner.  Specifically, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning "the intensity, persistence and limiting effects" of the symptoms were not "entirely consistent with the medical evidence and other evidence in the record."  (A.R. 15.)

Based on the RFC finding, the ALJ concluded that Plaintiff was incapable of performing her past relevant work as a receptionist, reservations clerk, and travel agent.  Notwithstanding this finding, however, the ALJ also found that given Plaintiff's age, education, work experience, and the RFC, that a significant number of alternative jobs existed in the national economy that Plaintiff could perform.  (A.R. 18.)  Specifically, the ALJ relied on the vocational expert's testimony that Plaintiff could perform the requirements of occupations like telephone order clerk, charge account clerk, and clerical assistant.  (A.R. 19.)

In sum, the ALJ concluded that Plaintiff was not disabled from July 15, 2015, through the date of the decision, October 17, 2018, and therefore, denied Plaintiff's application for disability benefits.  (A.R. 19-20.)

## II.   **STANDARD OF REVIEW**

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine

14

the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.*

15

at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See* 20 C.F.R. § 404.1520(b); *see also Yuckert*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c); *see Yuckert*, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  *Id.*  A claimant who does not have a severe impairment is not considered disabled.  *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List").  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits.  *See id.* at § 404.1520(d).  If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent.  *See* 20 C.F.R. § 404.1526(b).  If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment.  *Id.*  An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar.  *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four that he or she has not retained the RFC to perform his or her past relevant work.  20 C.F.R. § 404.1520(e); *Yuckert*, 482 U.S. at 141.  If the claimant is able to perform previous work, the claimant is determined to not be disabled.  20 C.F.R. §§ 404.1520(f); *Yuckert*, 482 U.S. at 141-42.  The claimant bears the burden of demonstrating an inability to return to the past relevant work.  *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Yuckert*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(a).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and is not disabled.  *See id.* at § 404.1523; *Plummer*, 186 F.3d at 428.

## III.   <u>ANALYSIS</u>

Plaintiff raises four issues on appeal.  First, Plaintiff argues that the ALJ erred in denying Plaintiff's claim for benefits because the RFC determination was inaccurate and does not reflect all of the limitations reasonably supported by the record.  Second, Plaintiff contends that the ALJ erred in the weight applied to certain opinion evidence, namely the recommendations supplied by Dr. Tennyson.  Third, Plaintiff maintains that the ALJ erred in his evaluation of the listing criteria set forth in 20 C.F.R. § 404.1525(a).  And, fourth, Plaintiff argues that the ALJ failed to discuss vocational testimony that was favorable to Plaintiff's claim of disability.

A.       **The ALJ's RFC Finding**

Plaintiff contends that the ALJ's RFC finding should have included even greater limitations with respect to her right hand and arm function, vision, and cognitive and emotional abilities.  (Pl. Moving Br., 20-29.)

"Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a).  The ALJ is responsible for making the ultimate determination of an individual's RFC.  20 C.F.R. § 404.1546; *see Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants— must make the ultimate disability and RFC determinations.").  "[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him," and, although the ALJ may weigh the credibility of the evidence, he must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."  *Burnett*, 220 F.3d at 121; *see Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."  *Cotter*, 642 F.2d at 705.  The ALJ must consider all relevant evidence when determining an individual's RFC, *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001), and a finding of non-severity "does not obviate the need for a separate analysis of how Plaintiff's impairment affects her RFC." *Soboleski v. Comm'r of Soc. Sec.*, No. 14–3156, 2015 WL 6175904, at *2 (D.N.J. Oct. 20, 2015). "Where the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently."  *Hagans*

*v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and citation omitted).

With respect to her right arm and hand limitations, Plaintiff argues that evidence in the record contradicts the ALJ's conclusion that Plaintiff had the ability to use her hands frequently for work. Specifically, Plaintiff claims that the ALJ failed to consider the findings of Dr. Jasper's consultative examination, as well as the myriad records from Plaintiff's physical therapy sessions, which reveal that, at most, she could only use her right hand occasionally for work. (*Id.* at 22.) Next, Plaintiff claims that she suffers from a serious vision problem, which goes beyond the ALJ's finding that Plaintiff only suffers from limited depth perception. (Pl. Moving Br., 27; Pl. Reply Br., 6.) In this regard, Plaintiff contends that she has blurred vision and occasional double vision, which, according to Plaintiff, necessitate accommodations that limit her ability to work efficiently with a computer and/or paper and pen. (*Id.*) Finally, Plaintiff maintains that the ALJ failed to consider her emotional and cognitive limitations when determining the RFC. (Pl. Moving Br., 28-29.) Specifically, Plaintiff contends that the ALJ improperly found that she does not have a severe mental impairment, and the ALJ's RFC did not take into account Plaintiff's crying, depression, slowed thinking and slowed cognitive processing speed, and limited stamina. (*Id.*)

Here, these arguments are belied by examining the ALJ's decision, however. In his multi-page decision, the ALJ noted that Plaintiff alleges disability due to a stroke, including symptoms such as "reading difficulty, vision problems, limitations of the right arm and right leg, cognitive difficulties and a right thumb problem." (A.R. 14.) The ALJ also specifically cited inconsistencies between Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms and the medical evidence and testimonial evidence presented in the record. (A.R. 15.)

First, with respect to Plaintiff's right arm and right hand limitations, the ALJ's decision clearly acknowledged that Plaintiff had "limitations of her right arm and right leg," that Plaintiff "reported that she could lift a gallon of milk," only with her left arm, and that Plaintiff needs assistance with dressing and grooming at times.  (A.R. 10-20.)  Moreover, contrary to Plaintiff's arguments, the ALJ's decision also clearly acknowledged the findings of Dr. Jasper's consultative examination in August 2016.  (A.R. 16.)  The ALJ decision noted that at the examination, Plaintiff presented with complaints of right upper extremity weakness, and that Dr. Jasper found that Plaintiff exhibited a "decreased range of motion from the right shoulder down, difficulty extending and opposing fingers of the right hand and muscle weakness of 2/5 on the right side, from the shoulder down."  (A.R. 16.)

However, the ALJ assigned little weight to the findings of Dr. Jasper, who he identified as a non-treating source.  The ALJ ordinarily "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993); *see also Louis v. Comm'r of Soc. Sec. Admin.*, 808 F. App'x 114, 119 (3d Cir. 2020) (citing *Mason*, 994 F.2d at 1067, for the proposition that "treating physicians' reports are entitled to greater weight than non-treating physicians' or a one-time examiner's").  Here, the ALJ reasoned that Dr. Jasper did not provide any functional limitations and relied "solely and exclusively on one observation made on the day of the examination and not upon objective long-term observations and examinations" of Plaintiff.  (A.R. 18.)

Rather, the ALJ applied more weight to the treatment notes of Dr. Wells Roth, Plaintiff's treating neurosurgeon, regarding her recovery from the first stroke, and Plaintiff's testimony regarding her daily activities and capabilities following her second stroke.  Indeed, under the

regulations, a treating source's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Here, Dr. Wells Roth examined Plaintiff one month <u>earlier</u> than Dr. Jasper, in July 2016, at which time he reported that Plaintiff was doing "very well," with only some "mild" right hand weakness. Dr. Wells Roth further reported that despite that complaint, Plaintiff's condition was "improving." (A.R. 16.)  He further opined that Plaintiff exhibited only slightly reduced (4+5/5) muscle strength in her right hand.  (A.R. 880).  As a result, Dr. Wells Roth concluded that Plaintiff had "no restrictions at this time and may return to normal daily functions as she feels comfortable with." (A.R. 881).  To be clear, none of Plaintiff's treating providers suggested that she could not use her right hand to work or that she could only use her right hand occasionally.  *Lane v. Comm'r of Soc. Sec.*, 100 F. App'x 90, 95-96 (3d Cir. 2004) (a lack of supporting medical opinion evidence from treating sources can be strong evidence that the claimant is not disabled); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (holding that the Commissioner is entitled to rely not only on what the record says, but also on what it does not say).

As for Plaintiff, she testified extensively at the hearing about her daily activities following her second stroke, which the ALJ considered in determining the RFC.  *See* 20 C.F.R. §§ 404.1529(c)(3)(i) (providing that the ALJ may consider a claimant's daily activities), 416.929(c)(3)(i) (same); *see also Hoyman v. Colvin*, 606 F. App'x 678, 681 (3d Cir. 2015) ("The evidence from [the claimant's] doctors and the evidence regarding his daily activities ... support the ALJ's finding with respect to [the claimant's] credibility."); *Loneker v. Comm'r of Soc. Sec.*, No. 17-2006, 2018 WL 5784996, at *4 (D.N.J. Nov. 5, 2018) ("The ALJ's decision is consistent with the Third Circuit's recognition that "[a]lthough 'any statements of the individual concerning

his or her symptoms must be carefully considered,' the ALJ is not required to credit them,"
particularly where such statements are undermined by evidence of a more active lifestyle.")
(quoting *Chandler v. Comm'r*, 667 F.3d 356, 363 (3d Cir. 2011)).  Here, as it pertains to the use
and function of her right arm and right hand, Plaintiff testified that she generally cared for her
personal needs and grooming and performed household chores.  (A.R. 299-300, 925, 1001-1661).
She also testified that she walked, drove, and rode a bicycle; could count change, handle a savings
account, and use a checkbook/money order; and shopped in stores, went to the gym, cut grass, and
cared for her young daughter twice per week.  (A.R. 298, 301-02, 925).  Moreover, in May 2018,
three months after her second stroke, she began working part-time at CVS Pharmacy.  (A.R. 76-
78, 1753.)

Next, the ALJ properly addressed Plaintiff's alleged visual impairments in his RFC
assessment.  Although the ALJ acknowledged that certain medical records reveal complaints of
blurred vision, double vision, and eye twitching, the ALJ found only that Plaintiff should not
perform work that requires good depth perception, and she should not operate a motor vehicle.  In
making this determination, the ALJ assigned partial weight to Plaintiff's assessment by Dr. Fejzo
following Plaintiff's first stroke.  While Dr. Fejzo diagnosed Plaintiff with "binocular diplopia and
alternating exotropia with V pattern," she found "no visual disturbances" on Plaintiff's visual
fields and did not provide any residual functional capacity limitations.  (A.R. 17.)  Moreover, the
ALJ again relied on the treatment records from Dr. Wells Roth, who noted that following her first
stroke, Plaintiff had visual acuity of 20/20 in each eye with "grossly intact visual fields."[2]  (A.R.
17.)  The ALJ also found that there was no evidence in the record of "significant deterioration"

---

[2]	Dr. Jasper similarly found that Plaintiff had 20/20 vision in both eyes during her August
2016 evaluation.  (A.R. 16.)

with her vision since her second stroke.  (A.R. 17.)  As a result, the ALJ reasonably determined that "any finding that [Plaintiff] has a non-severe vision problem is not supported by the overall objective medical evidence of the record," and accordingly, did not include such physical limitations in the RFC assessment (other than limitations relative to poor depth perception).  (A.R. 17.)

Finally, the ALJ's RFC assessment properly considered evidence related to Plaintiff's cognitive and emotional limitations, including her depression.  Indeed, the ALJ's decision cited Dr. Esposito's consultative psychological evaluation in August 2016, and Dr. Tennyson's neuropsychological evaluation in November 2016, discussed in more detail, *infra*.  With respect to Dr. Esposito, the ALJ highlighted that Dr. Esposito conducted a mental examination of Plaintiff in August 2016, at the request of the Disability Determination Service; however, the ALJ only attributed some weight to the doctor's opinion.  The ALJ reasoned that Dr. Esposito was not a treating source, and, like Dr. Jasper, she relied solely and exclusively on observations of Plaintiff from a single day, which occurred well before her second stroke.  *See Mason*, 994 F.2d at 1067.  Further, the ALJ noted that although the examination revealed that Plaintiff spoke with "slight garbling fraction" and some "slight intelligibility," her mood was anxious, and she cried intermittently throughout the evaluation, Dr. Esposito also found that Plaintiff exhibited appropriate concentration and focus, that she scored a 95 on the Wechsler Adult Intelligence Scale, which placed her in the average range of intelligence functioning, and she found only mild cognitive disorder due to Plaintiff's stroke.  Importantly, the ALJ commented that Plaintiff drove herself to the examination with Dr. Esposito.

Moreover, the ALJ's findings with respect to Plaintiff's cognitive and emotional impairments are consistent with other medical evidence in the record, including medical evidence

following her second stroke.  For example, at an examination in October 2015, just three months after suffering her first stroke, Dr. Wells Roth noted that Plaintiff demonstrated a normal ability to communicate, intact memory, normal attention/concentration, and an appropriate "fund of knowledge."  (A.R. 861.)  Similarly, at a follow-up visit in July 2016, one year after Plaintiff's first stroke, Dr. Wells Roth again documented Plaintiff's cognitive progress, reporting that she exhibited a normal ability to communicate, intact memory, normal attention/concentration, no aphasia, and an appropriate level of knowledge.  (A.R. 880.)  Following her second stroke, while Dr. Wells Roth noted in January 2018, that Plaintiff appeared disorientated with a cognitive disability and poor remote recall (A.R. 1749), a separate neurological specialist, Dr. Zhang, reported one month later, in February 2018, that Plaintiff was "generally healthy," oriented with fluent speech, and displayed intact cranial nerves.  (A.R. 1753-61.)   Notably, Dr. Zhang also indicated in March 2018, that Plaintiff's emotional condition, including her depression and intermittent crying, appeared "much better" since Plaintiff had been prescribed Nudextra.  (A.R. 1753.)

Put simply, the record revealed that Plaintiff made a substantial recovery after both strokes with persistent physical and occupational therapy, as well as medication management. (A.R. 15-17, 864-74, 1010-61, 1753-61, 1763-1825).  The record also confirmed that Plaintiff experienced notable improvement in her right arm and leg function, vision, and speech with treatment.  (A.R. 862, 924, 940, 1691, 1693, 1753, 1755-56, 1776).  Accordingly, the RFC assessment at step four was supported by substantial evidence.[3]

---

[3]     To the extent Plaintiff also argues that the ALJ did not consider "the entire relevant period," in reaching his step four determination, I do not find that argument persuasive.  The ALJ explained that he considered whether Plaintiff had been disabled within the meaning of the Act from July 15, 2015, the alleged disability onset date, through October 17, 2018, the date of the decision.  (A.R.

### B.    Consideration of Consultative Opinion Evidence

Plaintiff next contends that the ALJ erred in not assigning a specific weight to Dr. Tennyson's treatment recommendations, which she contends constitutes a medical opinion.  (Pl.'s Moving Br. at 31-32.)   Specifically, Plaintiff argues that Dr. Tennyson evaluated Plaintiff's "neuropsychological status in a very complete manner," more than a year after the first stroke and about six months prior to the second stroke, and that her recommendations constitute medical opinion evidence.   Plaintiff emphasizes that this is significant because this evaluation presented the best evidence of Plaintiff's condition prior to her second stroke, which only worsened her condition.  (*Id.*)   According to Plaintiff, the ALJ did not adequately consider Dr. Tennyson's recommendations, despite an absence of contradictory evidence in the record and Dr. Tennyson's recommendations are consistent with Plaintiff's physical and mental condition, as reported by other providers.  (*Id.*)   In response, Defendant argues that Dr. Tennyson's proposed treatment recommendations did not constitute a medical opinion that should have been explicitly weighed by the ALJ, and even if it was a medical opinion, the ALJ's failure to assign it a specific weight was not harmful legal error requiring remand.  (Def. Br., 21-22.)

At the outset, I agree with Plaintiff that Dr. Tennyson's report constituted a medical opinion in accordance with the definition set forth in 20 C.F.R. § 404.1527(a)(1), and that it cannot be disputed that the ALJ did not assign a specific amount of weight to Dr. Tennyson's opinion. However, I find Plaintiff's argument that this failure necessitates remand unavailing.   Indeed, the rationale underlying the requirement of express analysis is applicable when the Commissioner rejects or otherwise discounts some evidence in the record.  *See Norris v. Barnhart*, 197 F. App'x

---

10-20).  The ALJ's conclusion indicates that he did not find Plaintiff disabled for any 12-month period during the relevant period.  (A.R. 10-20.)

771 at *3 (10th Cir. 2007) ("When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened.") (citing *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir.2004)); 20 C.F.R. § 416.927(c)(1)-(2) (explaining that weighing of evidence occurs only when evidence is inconsistent with the record or internally inconsistent).

Here, there is no indication that the ALJ rejected or otherwise discounted Dr. Tennyson's findings following her evaluation. Rather, the ALJ's decision, taken as a whole, demonstrates that Dr. Tennyson's findings were consistent with the ALJ's findings. As explained in the ALJ's decision, Dr. Tennyson performed a neuropsychological evaluation of Plaintiff on November 17, 2016, more than one year after her first stroke and approximately three months before her second stroke. Dr. Tennyson diagnosed Plaintiff with "status post CVA, neurocognitive deficits secondary to CVA, [and] adjustment disorder with mixed emotional features." (A.R. 16.) The ALJ's decision acknowledged those diagnoses; the ALJ found that Plaintiff suffers from approximately nine severe impairments, including CVA, right spastic hemiplegia with vascular dementia, and neurocognitive deficits secondary to CVA. (A.R. 12.) Moreover, Dr. Tennyson's report recommended that Plaintiff could not perform her prior jobs, and the ALJ's decision adopted that recommendation. (A.R. 18.) Dr. Tennyson did not opine, however, regarding Plaintiff's ability to perform alternative sedentary jobs, like the ones provided by the vocational expert and ultimately adopted by the ALJ. Therefore, because Dr. Tennyson's recommendations did not contradict the ALJ's final RFC determination, the need to expressly assign weight or explicitly consider the weighing factors is lessened.

Moreover, like Dr. Jasper and Dr. Esposito, Dr. Tennyson's singular evaluation of Plaintiff only captures one specific and discrete moment in time. Unlike Plaintiff's treating providers, such

26

as Dr. Wells Roth or Dr. Zhang, Dr. Tennyson only examined Plaintiff on one occasion, and more importantly, she did not examine Plaintiff at all following her second stroke.  Accordingly, although the ALJ did not explicitly assign a certain quantum of weight or enumerate the factors affecting weight with regard to Dr. Tennyson's medical opinion, the ALJ sufficiently developed the record to permit meaningful judicial review.  *Molloy v. Astrue*, No. 08-4801, 2010 WL 421090, at *13 (D.N.J. Feb. 1, 2010).  To that end, the record, taken as a whole, demonstrates that substantial evidence supports the ALJ's consideration of Dr. Tennyson's opinion in reaching his final decision.  Therefore, remand is not required on this basis.

### C. The ALJ's Step Three Determination

Plaintiff contends that the ALJ's step three analysis was deficient because he did not consider the specific listings of 11.04 or 12.02, despite finding that Plaintiff has severe impairments for CVA and neurocognitive deficits.  (Pl. Moving Br., 32-33.)   Rather, Plaintiff claims that the ALJ only mentions his consideration of Sections 2.00 and 11.00 in "boilerplate format."  (*Id.* at 33.)  Moreover, Plaintiff contends that the ALJ does not discuss why Plaintiff's right hand impairment reported by Dr. Jasper does not meet the criteria set forth in 20 CFR 404 subpart P, Appendix 1, Listing 11.04 B and C.  (*Id.* at 33-34.)  According to Plaintiff, evidence in the record from physical therapy records, for example, establish that Plaintiff had disorganization of two extremities, upper and lower right side that persisted for at least three months after her first stroke.  (*Id.*) (citing A.R. 1793, 1803.)

At step three, the ALJ determines whether the claimant's impairments satisfy the criteria set forth in the Commissioner's "listings." 20 C.F.R. § 404.1525(a).  The listings are a regulatory device used to identify those claimants whose medical impairments are so severe that they would be found disabled regardless of their vocational background.  *Sullivan v. Zebley*, 493 U.S. 521,

532 (1990) (citations omitted).  To meet a listing, the claimant must show that the impairment "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement (see § 404.1509)." 20 C.F.R. § 404.1525(c)(3).  An impairment that meets only some of the criteria for a listed impairment, "no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530.

The Third Circuit "does not require the ALJ to use particular language or adhere to a particular format" when conducting the step three analysis.  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  Sufficient articulation exists at step three when the ALJ "explicitly stat[es] which Listings he was considering." *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 93 (3d Cir. 2007*); see also, Johnson v. Comm'r of Soc. Sec.*, 398 F. App'x 727, 734 (3d Cir. 2010).  Even in cases where the ALJ does not specify a particular listing, the ALJ's step three finding is sufficient where the evidence supports the ALJ's finding that the claimant's impairments did not meet or equal the criteria of a listing and the ALJ's analysis shows that he considered the evidence as it relates to the listing's requirements.  *Jones*, 364 F.3d at 505 (remand not required where the ALJ's decision "read as a whole" showed that the ALJ considered the appropriate facts when deciding a claimant did not meet a listing); *Scatorchia v. Comm'r of Soc. Sec.*, 137 F. App'x 468, 471 (3d Cir. 2005) (ALJ's step three explanation was adequate where the ALJ "clearly and fully evaluated and explained the medical evidence set forth in the record").  The ALJ's evaluation of the evidence must appear in the decision, but need not appear specifically in the listings discussion. S*ee Cop v. Comm'r of Soc. Sec.*, 226 F. App'x 203, 208 (3d Cir. 2007).

Here, to meet the requirements of Listing 11.04(A), (B) or (C), the claimant must demonstrate either: "[s]ensory or motor aphasia resulting in ineffective speech or communication (see 11.00E1) persisting for at least 3 consecutive months after the insult" or "disorganization of

28

motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult," or "[m]arked limitation (see 11.00G2) in physical functioning (see 11.00G3a) and in one of the following areas of mental functioning," both persisting for at least 3 consecutive months after the insult: (1) understanding, remembering, or applying information, or (2) interacting with others, or (3) concentrating, persisting, or maintaining pace, or (4) adapting or managing oneself.

As the ALJ noted throughout his decision, including in his summary of Plaintiff's medical treatment, Plaintiff adduced no evidence within the record capable of satisfying the requirements of 11.04(A), (B), or (C).  Just two months after her first stroke, Plaintiff had "progressed very well" in all disciplines, ambulated without a cane, and needed only minimal assistance in basic care activities (A.R. 587, 593, 867.)  In September 2015, three months after her first stroke, Plaintiff was regularly attending physical therapy and it was documented that she required only minimal assistance in basic care activities.  By October 2015, Plaintiff had experienced notable improvement in her upper extremity muscle testing.  (A.R. 867, 870, 873.)  Similarly, at a primary care visit three days following the hospital discharge after her second stroke, the visual overview of her four extremities was normal, and Plaintiff exhibited equal strength in her extremities, intact cranial nerves, normal balance and gait, normal coordination, and normal fine motor skills (A.R. 947.)  Indeed, Plaintiff can point to no evidence that she was unable to stand up from a seated position for a period of three consecutive months since the onset date.  Moreover, as for Plaintiff's use of her upper extremities, the regulations define "extreme limitation" as "loss of function of both upper extremities."  *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.00D(2).  Here, Plaintiff only claims marked limitation with respect to her right arm and right leg.  That is not sufficient.

Thus, substantial evidence supports the ALJ's conclusion regarding Listing 11.04. *Simmonds v. Hecker*, 807 F.2d 54, 58 (3d Cir.1986) (finding that if there is substantial evidence supporting the Commissioner's finding, the district court must uphold the decision even if it might have reasonably made a different finding based on the record).

Next, Listing 12.02, which relates to neurocognitive disorders, requires:

> ... a <u>clinically significant</u> decline in cognitive functioning. Symptoms and signs may include, but are not limited to, disturbances in memory, executive functioning (that is, higher-level cognitive processes; for example, regulating attention, planning, inhibiting responses, decision-making), visual-spatial functioning, language and speech, perception, insight, judgment, and insensitivity to social standards.

Subsection 12.02(B)(1)(a) (emphasis added). Here, the ALJ reasonably found, based on Plaintiff's objective medical records, that Plaintiff suffered from only <u>mild</u> limitations in understanding, remembering, and applying information; <u>mild</u> limitations in interacting with others; <u>mild</u> limitations in concentration, persistence, or maintaining pace; and no restrictions on adapting or managing oneself.

Importantly, this listing requires "[m]edical documentation of a significant cognitive decline from a prior level of functioning in one or more of several listed cognitive areas." Plaintiff, however, has failed to cite evidence that her cognitive functioning declined from a prior level over the several years of evaluations. *See Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) ("The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five.").

### D.    The ALJ's Consideration of the Vocational Expert's Testimony

Finally, Plaintiff argues that the ALJ failed to consider certain vocational testimony which supports a finding that Plaintiff is not capable of work. As recited above, Terry was asked to

consider two hypothetical scenarios during her testimony.  First, the ALJ asked Terry to assume a hypothetical person of Plaintiff's age, education, and work experience who could perform sedentary work as defined in the regulations, except she could frequently reach with the right upper extremity, including overhead; could frequently handle and finger; could never climb ladders, ropes, and scaffolds, or crawl; could not perform work that required good depth perception; could not operate a motor vehicle; could not be exposed to unprotected heights or moving mechanical parts; could tolerate frequent exposure to humidity/wetness, dust, fumes, odors, gases, and extreme cold or heat; could occasionally push/pull with the right upper extremity; was limited to simple, routine tasks; and time off-task would be accommodated by normal breaks.  (A.R. 153-54.)  Terry testified that the hypothetical person could make a vocational adjustment to a significant number of sedentary, unskilled jobs existing in the national economy, including the representative examples of telephone order clerk, charge account clerk, and clerical assistant.  (A.R. 155.)

Second, Plaintiff's attorney posed a similar hypothetical, but introduced certain additional restrictions.  Namely, Plaintiff's attorney asked Terry whether the same individual would be able to sustain employment if he or she had double vision and could not look at a computer screen for more than a few minutes at a time without taking continuous breaks, were limited in how long he or she could sit or stand continuously, required an assistive device like a rolling walker or a cane while standing, and had to take unscheduled breaks at work due to mood swings, crying, or being overwhelmed.  (A.R. 156-58.)  Plaintiff's attorney also asked whether Terry's conclusion would change if the hypothetical person could only occasionally use his or her right hand for handling, reaching, fingering, or grasping as opposed to having frequent use of his or her right hand.  (A.R. 157.)  Terry responded that the hypothetical individual would be generally unemployable with those additional limitations.  (A.R. 156-60.)  According to Plaintiff, these restrictions were proven

during Plaintiff's case before the ALJ, and therefore, the ALJ's finding that Plaintiff could perform the jobs cited in his decision, including telephone order clerk, charge account clerk, and clerical assistant, was erroneous.  (Pl. Moving Br. at 36.)

I find this argument to be unavailing.  The ALJ may disregard vocational expert testimony in response to a hypothetical question based on limitations that are inconsistent with or unsupported by the record evidence, including limitations that are based on the claimant's subjective complaints.  *Szallar v. Comm'r Soc. Sec.*, 631 F. App'x 107, 111 (3d Cir. 2015); *Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir. 2004); *see also Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d. Cir. 1987) (stating that an ALJ is not required to credit a vocational expert's testimony in response to a hypothetical question based on the claimant's subjective complaints).  Here, for the reasons set forth at length in the Analysis section of this Opinion, the ALJ's finding that the additional restrictions and limitations posed in counsel's hypothetical scenario to Terry, as they relate to Plaintiff's use of her upper extremities, her vision, and her cognitive and emotional deficiencies, was unsupported by the medical and testimonial evidence in the record.  Accordingly, I find that it was both reasonable and appropriate for the ALJ to accept only Terry's testimony in response to the hypothetical question that included the limitations in the RFC finding.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court finds that the ALJ's decision was supported by substantial evidence in the record.  Accordingly, the ALJ's decision is **AFFIRMED**.

Dated: February 25, 2021                                  /s/ Freda L. Wolfson
                                                         Freda L. Wolfson
                                                         U.S. Chief District Judge